**COMMONWEALTH LIFE INSURANCE COMPANY, Appellant,**

v.

**Arthur ELLIOTT et al., Appellees.**

Court of Appeals of Kentucky.

Jan. 26, 1968.

Logan E. Patterson, Robert Berger, Pineville, Charles A. Robertson, Ogden, Robertson & Marshall, Louisville, of counsel, for appellant.

Lohren F. Martin, Jr., H. M. Sutton, Sutton, Martin & Forcht, Corbin, for appellees.

CLAY, COMMISSIONER.

Appellees as beneficiaries recovered a judgment of $7,000 against appellant on a life insurance policy issued in the name of their grandson Donald Elliott who was killed in an automobile accident. The principal defense was that the policy had lapsed for nonpayment of premium.

Appellees had taken out four insurance policies with appellant, three on their own lives and one on their grandson. The premiums were payable on a weekly basis but were collected monthly in cash from appellees.

On March 10, 1965, appellant's agent stopped at appellees' house to collect the monthly total of weekly premiums on all four policies, which would have required a payment of $17.75. (This would have included two past due weekly premiums and three premiums paid in advance.) The payment then made by Mr. Elliott, one of the appellees, was $13.80. The controversy in the case involves the factual and legal effect of this payment.

According to appellant's agent, appellees wished to drop their grandson's policy. The weekly premiums due on that policy for the month of March (the first of which was due March 1) would have been $3.95. Deducting this amount from $17.75 gives a figure of $13.80, which was the exact amount due to keep the other three policies in force. On the premium receipt book, which was returned to appellees and was in their possession at all times, the agent crossed out the name of Donald Elliott as an insured and listed five weekly premium payments of $2.76 (totaling $13.80 for the month), the total of weekly premiums payable on the other three policies.

The following month, on April 7, the agent collected $11.04 and entered in the receipt book four weekly premium payments of $2.76, the exact amount of premiums payable on the other three policies for that month. At no time did appellees pay or offer to pay the required premiums to keep all four policies in force after March 1. The premium receipt book is documentary evidence that no premiums were paid on the grandson's policy after March 1.

The reason for the payment of $13.80 on March 10, instead of $17.75 which was then due (according to the customary way appellees paid these premiums), is explained by appellee Elliott in the following manner. He stated there was no discussion of dropping the grandson's policy but it just happened that $13.80 was every penny he had at the time. He also said he told the agent that the balance of the premiums would be paid in April. (He made no tender of this

balance when the agent made his collection on April 7.)

Appellees' theory of recovery is that if appellant's agent had applied the $13.80 pro rata on all four policies, this would have kept them in force until March 15, and with the grace period, the grandson's policy would have been in force when he was killed on April 10.

Though several questions are raised on appeal, we believe the controlling issue is whether appellant was entitled to a directed verdict on the ground the evidence conclusively shows a default in the payment of premiums on the grandson's policy after March 1.

No one questions the requirement of the policy that premium payments be made in advance. The appellees admit a failure to pay on March 10 the full amount collectible on all policies. The premium receipt book, which was in appellees' possession and with respect to which no notation is disputed, shows that the listed policy issued on the life of the grandson was marked out in ink and this obliteration of the policy notation was on the book when it was returned to appellees on March 10. This book also showed that for the month of March, and the following April, appellant's agent had collected weekly premium payments of $2.-76, which was the aggregate of premiums due on the three policies on their own lives. These premiums were listed and totaled in the front of the book. This documentary evidence clearly establishes that no premium payments after March 1 were being applied on the grandson's policy, and fully supports appellant's agent's version of the March 10 transaction.

■ To overcome the consistent and apparently normal course of conduct on the part of the insurance company, we have the testimony of the appellees to the effect that they did not intend to drop the insurance on Donald. Here is a case, however, where the documentary evidence and the actions of appellees speak louder than this lone statement of intent. We have already discussed what the premium receipt book shows. While it is true appellees were unable to read or write, they must be bound by what the unquestioned notations in that book disclosed (just as the insurance company was bound), particularly since there is no proof of misrepresentation, bad faith or overreaching on the part of appellant's agent.[1] Having entered into a contractual business relationship with appellant, and after a voluntary default which they made no attempt to rectify, appellees cannot avoid on the grounds of illiteracy a proper handling of their account.

The only evidence for appellees did no more than put them in an equivocal position. They do not say they advised the agent to apply part of the $13.80 payment to their grandson's policy. They apparently knew that the agent could not waive the payment of this premium because their counsel's brief specifically disclaims such a theory. Taking appellees' evidence as true (although their reason given for the payment of $13.80 strains one's credulity), it shows no more than the lack of a meeting of the minds with respect to the application of this payment. Yet the premium receipt book gave appellees notice of how it was accepted and applied.

■ The overwhelming evidence in this case supports appellant's position that when appellees on March 10 tendered the agent the sum of $13.80, he applied that payment in the only reasonable way he could in the absence of specific directions to apply it otherwise.[2] By virtue of the notations in the premium receipt book, appellant kept in full force and effect until April 1 the three policies on the lives of appellees. Had a subsequent claim arisen on one of those

1. It appears obvious it would have been to his interest to continue to collect premiums on all four policies.

2. Neither the record nor the briefs go into the mechanics of pro rating premium payments, or the authority of an agent to accept part payments.

policies, appellant would have been estopped to claim that it had applied part of these premiums to the grandson's policy. The rights of the parties were fixed on March 10 (and confirmed by the premium payments in April), and there is no evidence of substance to support the claim that the grandson's policy was in full force and effect on April 10. (The extended insurance provision of this policy, which did not extend accidental death benefits, was still in force and appellant has paid the beneficiaries $1,000, the face amount of this policy.)

It is our opinion that the evidence was insufficient to prove a rightful claim on the policy sued on and a verdict should have been directed for appellant at the conclusion of all the evidence. Since this motion was overruled, appellant should have been granted judgment notwithstanding the verdict in accordance with its motion therefor.

The judgment is reversed, with directions to enter judgment for the appellant.

All concur.